**STATE of Missouri ex rel. GUS T. HANDGE & SON PAINTING CO., Respondent,**

v.

**TRI–STATE CONSTRUCTION CO., et al., Appellant.**

No. 46668.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 27, 1983.

Mark G. Arnold, St. Louis, for appellant.

Richard A. Stockenberg, St. Louis, for respondent.

CRANDALL, Judge.

Respondent Gus T. Handge & Son Painting Co. (Handge) and appellant Tri-State Construction Co. (Tri-State)[1] claimed and counterclaimed, respectively, for breach of a contract which obligated Handge to paint the steel components of four bridges that Tri-State constructed in Marion County, Missouri. Handge's claim was for the unpaid balance of the contract price of its painting work. Tri-State's counterclaim was for the amounts it paid for Handge to do preparatory sandblasting—work which Tri-State contends Handge was already obliged to perform under its painting contract. The case was tried to the court, which found for Handge on both claims. Tri-State appeals from the adverse judgment on its counterclaim. We affirm.

The steel components arrived at the construction sites with a shop coat of inorganic zinc primer which had been applied by another Tri-State subcontractor engaged in both fabricating the steel and erecting the bridges. Under the contract, once the steel was erected Handge was to "touch-up and [apply] one coat of vinyl green [paint]" to those components according to specifications therefor set out in the Missouri Standard Specifications for Highway Construction (hereafter Standard Specifications). Tri-State's president testified that when the time arrived for Handge's performance, the bridges' structural steel had "very slight rust, maybe a scratch here and there" sustained during shipment, handling and erection. All the nuts, bolts and washers, however, had arrived from the fabricator coated only with an "oil treatment" and had been used unpainted. Acting under specifications that all of the bridges' steel surfaces be coated with the inorganic zinc primer, state inspectors at the construction site refused to allow Handge to proceed with painting until the unpainted surfaces and the surfaces to be spot-primed were sandblasted according to the Standard Specifications. A dispute arose between the parties over who would do the sandblasting. They resolved their dispute through a compromise "interim agreement," under which Handge contributed a painter to do the sandblasting and prime coating at cost, and Tri-State contributed the equipment and supplies for the sandblasting. It is the amount of its payments to Handge together with the value of its contributions under the interim agreement that Tri-State sought to recover by its counterclaim.

■ The dispositive question is not, as urged by Tri-State, whether the parties' initial painting contract obliged Handge to sandblast the steel. Rather, it is whether, as the trial court found, "there existed a good faith, disputed claim between Handge and Tri-State over the extent to which, if at all, Handge was obligated to sandblast the steel." If there was such a good faith dispute, Tri-State's acceptance of Handge's promise to perform under the interim agreement constitutes the consideration required to validate that agreement, for "[t]he rule that performance or promise to perform an existing legal obligation is not valid consideration yields an exception where the existence of the legal duty is the subject of an honest and reasonable dispute." *Coffman Industries, Inc. v. Gorman-*

---

1. Handge cross-appealed, and its appeal was consolidated with that of Tri-State. Handge's sole point on appeal merely urges additional grounds for judgment in its favor and we need not pursue it. We will therefore refer to the parties as they are designated in Tri-State's appeal.

*Taber Co.,* 521 S.W.2d 763, 771 (Mo.App. 1975). And if the interim agreement is valid, the amount for which Tri-State counterclaimed represents merely the expense it incurred in performing its agreement rather than any liability of Handge.

■ We need not go beyond the parties' initial contract for painting to find a reasonable basis for Handge's denial that it had contracted to do any sandblasting. No reference to "sandblasting" appears in the contract itself, the relevant portion of which we quoted earlier. Under the Standard Specifications the contract incorporated, Section 712.12.9.2 thereof captioned "Work Under Separate Contracts"[2] is amenable to the interpretation that Tri-State's subcontractor for erecting the bridges, not Handge, is responsible for the "touch-up painting of newly erected work" and the sandblasting that entails.[3] As for the unpainted bolts, nuts and washers, Handge could reasonably doubt that by agreeing to do "touch-up" painting it had agreed to sandblast unpainted surfaces—work which the record suggests occupied three workmen for nearly six months and which would have cost Handge nearly two-thirds of its gross profits from the painting work to perform.

The judgment is supported by the evidence and there is no error of law. Rule 73.01(c).

Affirmed.

KAROHL, P.J., and REINHARD, J., concur.

2. 712.12.9.2 *Work Under Separate Contracts.* If complete field painting is not included in the contract for erection of structural steel, the touch-up painting of newly erected work and the painting of surfaces which will be inaccessible after erection shall be included as part of the work to be performed under the contract for erection. Field painting under any contract that does not include the erection shall include cleaning and spot painting required at the time the work is performed.

3. The Standard Specifications further provide: 712.12.2.2—Surfaces to be painted with inorganic zinc primer shall be blast cleaned with

abrasives producing a nominal height of profile of 1.5 mils. The blast cleaned surfaces shall meet the following requirements:

\* \* \* \* \* \*

712.12.2.3 After blast cleaning, the surfaces shall be brushed with clean brushes, blown off with compressed air, or cleaned by a vacuum to remove any trace of blast products on the surface, and also for the removal of abrasives from pockets and corners .... All rusted, damages, or unpainted areas to be spot primed and the field shall be cleaned to the same degree specified above.